J. Irwin Shapiro, J.
At the end of the plaintiff’s case, the defendant Ellis Chingos Construction Corp. (hereinafter called “ Chingos ” or “ defendant ”) moved for a dismissal of the complaint. Decision was reserved. Without offering any proof, the defendant then rested, renewed its motion for dismissal and also moved for a directed verdict in its favor. Decision was likewise reserved on these motions.
The jury brought in a verdict for the plaintiff in the sum of $18,500, whereupon defendant renewed its previous motions and also moved ‘ ‘ to set aside the verdict on the ground it is excessive.” Decision was reserved on all of the motions with leave to both sides to submit memoranda. The plaintiff has submitted a memorandum of law; the defendant has not.
*270 The defendant was engaged in the construction of the Meadow Drive Elementary School at Albertson, Long Island. Its “ contract called for construction of the building itself,” but it had nothing to do “ with the mechanical trades such as the electricians, plumbing and heating and sheet metal. ’ ’
In connection with the performance of its contract Chingos ‘ ‘ let out the excavation subcontract, masonry and brick work subcontract, steel-roofing contract, roofing, painting, asphalt, tile.” That covered “ 15 or 20 subcontracts ” in addition to the “ concrete work and carpentry work ” which it was doing itself.
Chingos had “a superintendent on the job” whose responsibility it was “ to control its workmen and, in addition, “ to co-ordinate the work of the subcontractors. ’ ’
The plaintiff was employed by the Atlas Erectors Co., a subcontractor engaged by one of Chinos’ subcontractors to do the steel work on the building. On March 15, 1954 he had been on that job “ about two days, two and a half days he was on the job with 1 ‘ four or five other men” in his crew; their job was “putting steel beams in on the roof — on the extension of the school,” a “ one-story affair ”; “ other trades * * * were working all over the job ”; “ once the steel was raised to the level of the roof, you would then go up the ladder in order to be able to get into a position on the walls to bolt this steel in place ”; “ there was only one ladder there ” and “ everybody just used it just to get up to the top of the roof ” including laborers “ working on the front sections ” of the building.
After plaintiff had ascended the ladder and had completed the work with the steel then on the new section of the roof, he had to go down the ladder to “ set up another piece of steel.” As he was descending the ladder it “ gave way on the bottom ”; it “ started sliding out from under me ” and “ I knew I was going down, so I jumped to one of these bar joists and I grabbed hold of it, and I couldn’t hold on and I just fell to the ground ” some “ 15, 18 feet ” below. “ It was moving out and I knew darn well I had to get off it.” This ladder “ was always in the same place ” standing on “ loose gravel ” in a “ gravel bed on the ground ’ ’ leaning against the wall on the top and “ out from the wall, four, five feet ” at the bottom.
Whatever relationship Chingos may have borne to the school board or to other prime contractors on the job, it was the general contractor so far as plaintiff and his employer were concerned.
The contract which Chingos entered into with the owner was “ for the general construction of the building.” This, without more, was sufficient upon which to base a holding that Chingos (as to its subcontractors) was the general contractor even *271 though there were other prime contractors on the job. A 61 1 General contractor ’, in a building contract sense, is any person who contracts directly with the owner, the phrase not being limited to one undertaking to complete every part of the work.” (17 C. J. S., Contracts, p. 334.)
Chingos had the right to and did actually direct its 15 or 20 subcontractors on the job and co-ordinate and integrate the work of each of them. Thus, by every test of supervision and control of the various work activities necessarily engaged in by Chingos to fulfill “ its contract of general construction,” it had general over-all authority on this job as to all of the work it was required to do.
The undisputed proof shows that the ladder was in the same position in the new wing for at least two days prior to the accident, and that it was being used by all of the laborers as the sole existing means of access from the floor of the structure to the roof.
Chingos had a nondelegable obligation to provide safe ways and approaches for all of the laborers working on its subcontracts, plaintiff included, and any violation of this duty on its part obligated it to respond in damages to any worker injured as the result of such default in its duty.
In my charge to the jury I stated the applicable law to them, in part, as follows:
‘ ‘ So that so far as these subcontractors were concerned, these people to whom Chingos let out each division of this work which it was obligated to do under its contract with the school authorities, it became a general contractor and they became subcontractors.
“ Now, what is the duty of a general contractor to his subcontractors and to the employees of the subcontractors? Well, the law, in an effort to protect people who have to work for their living in hazardous occupations, says that under those circumstances the general, or prime, contractor must supply to those who are employed by his subcontractors a safe place to work.
“ Now, the testimony of the plaintiff, or the claim of the plaintiff, is that the place to work supplied here was not safe. And he says that he was an employee of a subcontractor, an employee of Atlas. He also says this: that this ladder was used in common fey the laborers of Chingos, the defendant’s subcontractors; that it was the only means of access to the first floor roof; that the steps had not been installed and that that was used, so the plaintiff says, for the two days that he was there by the laborers in common as a common way. * * * the law doesn’t care, whether or not this was Chingos’ ladder. *272 * * * If the ladder was used as a common way, as a common staircase, and was so permitted to be used with the knowledge and consent of Chingos by the laborers of his subcontractors, that being the only available way supplied for getting to the first story, then Chingos, the defendant, is responsible for any defective conditions that might have obtained in connection with the use of that ladder. * * *
“ The plaintiff says, however, that he wasn’t given a safe place to work because this ladder was placed in such a way upon a soft gravel bed that in the ordinary expectation of things the defendant should have realized that with a number of laborers walking up and down without it being tied down solidly at the bottom, without it being affixed in some way, it might reasonably have a tendency to slip. And that is just exactly what happened, says the plaintiff. And he says that by reason of that occurrence the defendant did not afford him a safe place to work. * * *
“ If it was used as a common way, under the circumstances that I have indicated, then you go to the next question: Was it placed there in a reasonable position or was the defendant careless in permitting it to be used in the way in which it was, in the way in which it was standing, with the top up against the wall, with the bottom some four or five feet out, without any definite tied affixation to the wall or to the bottom gravel upon which it was standing.
“ Did the defendant know that it was going to, or might, slip ? Should the defendant have been aware in the reasonable exercise of vigilance — reasonable vigilance — that that could happen and should the defendant have foreseen it?
“ If the defendant should have foreseen it — if a reasonable man would have foreseen the likelihood of this occurring under the circumstances that I have outlined, then you may say that the failure of the defendant to see that the ladder was firmly affixed so that the slipping would not occur was carelessness, or negligence, and that would warrant you in finding a verdict for the plaintiff on that phase of the case.”
Implicit in the verdict of the jury is a finding that this ladder was a common way used by all of the defendant’s subcontractors as a sole means of access to the extension roof and that it was placed without any definite, tied fixation to • a wall or to the bottom gravel bed upon which it was standing, and that that constituted a hazardous condition.
The charge was, I believe, in accord with the existing state of the law. (Tiller v. Paul Tishman Co., 3 A D 2d 769; Shanahan *273 v. Crestonia Constr. Corp., 207 App. Div. 680, affd. 238 N. Y. 626.)
The facts in the Tiller case are virtually identical with the facts here. In affirming a judgment for the plaintiff, “ an employee of a subcontractor on a building under construction to recover damages for personal injuries sustained when he fell off a ladder which slipped and shifted ” the court said: “ The ladder had been used for weeks by employees of subcontractors of appellant, including employees of the respondent’s employer, a subcontractor of one of appellant’s subcontractors. Appellant was operating under a contract for the ‘ general construction ’ of a school. In the situation revealed by the record, appellant, with regard to respondent, was in the same position as if it had been a general contractor operating under a contract for the complete construction of the building.”
I can find no distinction between the Tiller case and this one, and I have read not only the memorandum opinion of the Appellate Division, but also the record on appeal.
The charge that whether the defendant owned the ladder was immaterial, if it was adopted as a passageway by Chingos for the use of its own and its subcontractors’ employees, was also proper. (Shanahan v. Crestonia Constr. Corp., supra.) The court there said (207 App. Div. 680, 681-682: “The evidence in this case would have permitted the jury to find that the defendant adopted the runway as its own and permitted subsequent contractors to use it. (Quigley v. Thatcher, 207 N. Y. 66.) Under these circumstances the defendant would have been liable for any defect in the runway which existed for a sufficient length of time to give the defendant notice thereof and which it had not remedied.” (See, also, on this question, Adler v. Tully & Di Napoli, 274 App. Div. 1001, affd. 300 N. Y. 662.)
If it be contended that the ladder was an appliance or tool for which the defendant, as general contractor, was not responsible (Butler v. D. M. W. Constr. Co., 286 App. Div. 828, affd. 309 N. Y. 990), and not a right of way or a place of work for which it is responsible, the answer is found in Mizak v. Carborundum Co. (172 App. Div. 627, 630) wherein the court said: ‘ ‘ A ladder permanently placed, as this one was, to afford the workmen the means of getting back and forth between the ground floor and the second floor must, we think, be considered as a way or as a part of the place to work rather than as a tool or appliance ”. (See, also, on this general question, my opinion in Ehrlich v. C. B. S. Columbia, 16 Misc 2d 793, 797, affd. 9 A D 2d 943.)
*274 Whether the ladder, as placed in á soft gravel bed without being affixed in any manner to the side of the building or to the ground, was thus maintained in a negligent or dangerous manner, was a pure question of fact which the jury on plaintiff’s testimony — uncontradicted and unrebutted by anything offered by the defendant — had a right to answer in the affirmative. (Tiller v. Paul Tishman Co., supra; Avesato v. Tishman Co., 142 N. Y. S. 2d 760; Kozman v. Trans World Airlines, 236 F. 2d 527; Koenig v. Patrick Constr. Co., 298 N. Y. 313.) Thus, the record is sufficient to warrant the jury’s findings of negligence on the part of the defendant.
The contention urged by defendant in its various motions ‘ ‘ for a dismissal of the cause of action on contributory negligence as a matter of law” is palpably without merit and requires no discussion (Nelson v. Nygren, 259 N. Y. 71, 76; Kaplan v. 45th Ave. Corp., 267 App. Div. 272, 274; Lunea v. Elmwood Gardens, 22 Misc 2d 255).
After the rendition of the verdict defendant moved to set it aside as excessive. While the amount awarded by the jury is more than I would have given if I were the trier of the facts, I was not the trier of the facts, and the amount, considering the uncontradicted testimony in the record, is not so great as to shock the conscience of the court. As the court said in a similar situation, ‘ ‘ It was not within the province of the trial court, under these facts, to substitute his idea of damages for that of the jury ” (Cesario v. Demetria Realty Corp., 250 App. Div. 272, 273). The rule is that where the difference between the Trial Justice and the jury is that of two reasonable minds arriving at different conclusions, and reasonable minds could draw different reasonable inferences from the proof, the verdict of a jury in fixing unliquidated damages should not be disturbed.
One must presume that the defendant had a physical examination of the plaintiff by a doctor of its own choosing or by a court-appointed physician; at least such was its right. No medical evidence was produced by it. The jury was therefore entitled to consider the evidence in the record and which the defendant might have contradicted, in its most favorable aspect for the plaintiff (Milio v. Railway Motor Trucking Co., 257 App. Div. 640; Noce v. Kaufman, 2 N Y 2d 347; Laffin v. Ryan, 4 A D 2d 21).
The testimony which the jury had a right to consider and believe showed that the plaintiff was in the hospital for “ about a week ”; that he was put in traction; that he wore a cervical collar; that when the collar was taken off ‘ ‘ the pain was greater ”; that he stayed home from work by reason of the pain *275 for “ about seven weeks ” wearing the cervical collar continuously; that he has had pain “ in my neck and shoulders ” ever since, that ‘ ‘ it comes and goes when I do hard work ’ ’ and ‘ ‘ bed rest is about the only thing” that helps. The Long Island College Hospital diagnosis was “ whiplash injury to the neck.” This diagnosis was confirmed by plaintiff’s expert who testified that on February 7, 1956 he found plaintiff to be suffering from 1 ‘ tenderness of the muscles of his neck on the posterior aspect of the-neck on both sides, more marked on the right side.” Again, four years later, on February 15, 1960, when the same doctor examined the plaintiff, he found that plaintiff ‘1 had persistent tenderness in the neck muscles on the posterior aspect of his neck * * *. This tenderness of the muscles of the neck on both sides, more marked on the right side, with persistent pain is permanent.”
The special damages in this case were $1,342 ($1,200 loss of earnings and $142 hospital bill — the medical expenses were not proved). Thus the amount awarded for the injury and its permanency was $17,158. While I realize that pain can be of varying degrees and intensity and that, therefore, verdicts in other cases are not necessarily a proper yardstick, it would seem that if an award of $15,000 for pain and suffering for 44% hours, during not all of which the injured person was conscious, is not excessive (Weber v. United Air Lines, 282 App. Div. 666), and that $5,000 for two hours of pain and suffering is not beyond legal'acceptability (Norton v. Phillips Petroleum Co., 262 App. Div. 881, appeal dismissed 286 N. Y. 721), then the amount of the verdict in this case is one upon which reasonable minds could rationally differ. I am therefore not warranted in disturbing it.
For the reasons given, all of defendant’s motions, upon which decision was reserved, are denied, with an exception, and defendant is granted a 10 days’ stay of execution and 60 days to make a case.
If the judgment in this case is appealed, the defendant will no doubt submit a comprehensive brief to the Appellate Division in an effort to show errors in the determination here reached. It would have been most helpful if the defendant had taken the time and trouble to submit even a short memorandum of law to point out to the court what it considered to be errors committed during the trial, or any impropriety in the verdict. Submit order.